UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CHRISTOPHER WILSON,

      Plaintiff,

v.

                            Case No.: 2:21-cv-861-JLB-NPM

COLLIER COUNTY,

      Defendant.

_____/

## ORDER

Plaintiff Christopher Wilson brings this employment discrimination suit against his former employer, Collier County ("Defendant").  Mr. Wilson asserts claims of racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981").  Pending before the Court is Defendant's motion for summary judgment.  (Doc. 50).  After careful review of the pleadings and the entire file, the motion is **GRANTED**.

## BACKGROUND

### I.    Factual Background

The following facts are undisputed except where otherwise noted.

Mr. Wilson's offer of employment with Collier County.

On June 1, 2020, Collier County made a contingent offer of employment to Mr. Wilson by way of a written letter.  (Doc. 43-1 at 352).  Mr. Wilson's contingent

1

employment offer made clear that: "This position *requires* that you [ ] obtain and maintain a Class A CDL with Air Brake and Tanker Endorsements within 6 months of hire." (*Id.* (emphasis added)). The letter also states: "You are also *required* to obtain and maintain the following within six (6) months of employment: a valid IMSA Work Zone Safety certification, Florida Department of Transportation (FDOT) Traffic Safety in the Work Area certification, and an Aquatic Spray License or Restricted Use Ornamental & Turf Pesticides Applicator's License." (*Id.* (emphasis added)). The offer was contingent upon "the successful completion of the County's post-offer screening process." (*Id.*) Mr. Wilson confirmed that he read and signed the contingent offer letter. (*Id.* at 19, 25).

On June 8, 2020, Collier County sent Mr. Wilson another offer letter which reiterated that "[t]his position *requires* that you . . . obtain and maintain a Class A CDL with Air Brake and Tanker Endorsement within 6 months of hire." (*Id.* at 353. (emphasis added)). It also restated: "You are also *required* to obtain and maintain the following within six (6) months of employment: a valid IMSA Work Zone Safety certification, Florida Department of Transportation (FDOT) Traffic Safety in the Work Area certification, and an Aquatic Spray License or Restricted Use Ornamental & Turf Pesticides Applicator's License." (*Id.* (emphasis added)). Mr. Wilson admits that he did not have a Class A CDL at the time of the June 1, 2020, letter or the June 8, 2020, letter, but maintains that it was his understanding that the licenses were "not mandatory." (Doc. 62 at 1).

<u>Mr. Wilson begins working for Collier County and inquires about licensure.</u>

As contemplated by the June 8, 2020, letter, Mr. Wilson began working for Collier County on June 22, 2020, as a senior crew leader with the road maintenance ("RM") division of the growth management department. (*Id.* at 10, 18, 26, 48, 352). Mr. Wilson testified that after he started working, he "went to all three of [his] supervisors that [he] had within a two-month span and asked about the Class A CDL . . . that [he] needed, and the spray license that [he] needed" and that he "was told by all three don't worry about it, you don't need it." (*Id.* at 35–36). He testified that he was told by one of the three supervisors that the "only thing [he] should be worried about instead of [his] license was a having a shovel in [his] hand." (*Id.*) He further stated that he asked his supervisors about "the classes [and] the course that [he] needed to take" and that he "did what [he] was supposed to as an employee by going to [his] supervisors and asking about these licenses that [he] needed to have for [his] job." (*Id.* at 37). Mr. Wilson indicated that the three supervisors he had asked about the Class A CDL were Daren Duprey, William Booker, and Scott Pickens. (*Id.*) Mr. Wilson testified that he does not have anything in writing from any of his supervisors, indicating that he was not required to obtain a Class A CDL or the Aquatic Spray license. (*Id.* at 38). Each of the supervisors submitted an affidavit in connection with Defendant's summary judgment motion, and they each disputed Mr. Wilson's testimony.

Mr. Duprey confirmed that he was Mr. Wilson's supervisor in the RM division from June to August 2020, and that Mr. Wilson asked him if he needed to get his

3

Aquatic Spray license and a Class A CDL.  (Doc. 46 at 2).  Mr. Duprey stated that he was aware that Mr. Wilson had been advised at the time of hire that he needed to obtain both, but he checked with the RM Division Director anyway.  (*Id.*)  Mr. Duprey stated that he informed Mr. Wilson that Mr. English confirmed that he was required to obtain the Aquatic Spray license and the Class A CDL and that Mr. Wilson did not ask him about these requirements again.  (*Id.*)  Mr. Duprey also stated that Mr. Wilson was required to get a Class A CDL when he was promoted to the "Supervisor, RM" position and that he gave Mr. Wilson information about the company he went to for his Class A CDL training and testing.  (*Id.* at 2–3).  Finally, Mr. Duprey stated that he did not have an Aquatic Spray license because he never held a position at Collier County that required him to have or obtain one.  (*Id.* at 3).

Mr. Booker stated that he was Mr. Wilson's supervisor from August or September 2020 through about mid-October 2020.  (Doc. 47 at ¶ 8).  Unlike Mr. Duprey, Mr. Booker has no recollection of Mr. Wilson asking him about the Class A CDL.  (*Id.* at ¶ 9).  He stated he never told Mr. Wilson that he was not required to obtain a Class A CDL or an Aquatic Spray license.  (*Id.* at ¶¶ 10–12).  Mr. Pickens testified that Mr. Wilson talked about the Class A CDL.  (Doc. 44-1 at 173).  He explained that he did not specifically tell Mr. Wilson that he did not have to get the CDL Class A license and the Aquatic Spray license or that he could ignore the requirement.  (*Id.*)  He indicated that Mr. Wilson "said something along the lines that there [were] other people that . . . didn't have it, and according to him

aren't required to have it that should have it, but they're making him do it." (*Id.* at 173–74).

<u>Collier County audits licensure compliance.</u>

On or about March 1, 2021, an anonymous complaint was submitted to Collier County claiming that "there may have been people that . . . did not have the license that they needed to do their job." (Doc. 56-1 at 26, 105–06). The anonymous letter held several specific statements about Mr. Wilson's alleged behavior on job sites, stating that he was "a very bad criminal," that he "did something to Catie the safety person and she had to quit," that he "rides around in a pickup and doesn't do any work[,] he just stands there and watches the other guys work," that "a bunch of [the RM department] [was] scared about this," and that "everyone says [he] does not have the class A license that he is supposed to." (Doc. 56-1 at 106). Ms. Lyberg testified that she does not know who sent this letter, but that the letter caused Human Resources to review everyone who had been hired within a certain period of time—January 1, 2018 through February 28, 2021, Doc. 45-1 at 1)—and verify whether they had achieved the necessary licenses and qualifications, which Human Resources had not done in at least six years, if ever. (Doc. 56-1 at 26).

Collier County's Human Resources Department conducted an audit "to gather information about employees in [RM] . . . and who had or had not achieved required job qualifications for the position each held." (Doc. 65 at ¶ 8; Doc. 65-1). The audit reviewed "RM employees hired from January 1, 2018 to February 28, 2021, [and whether they] had not obtained the job requirements they were required to obtain if

they did not already possess them at the time of hire." (Doc. 65 at ¶ 10).  The audit produced "a summary chart[1] that was prepared at HR's request in March 2021 . . . in conjunction with the audit that was performed to gather information about employees in [RM] . . . and who had or had not achieved required job qualifications for the position each held." (Doc. 65 at ¶ 8; Doc. 65-1).

Mr. Wilson is informed that he must become licensed by June 15, 2021.

After the audit was completed, Mr. Wilson was informed, by way of a memo dated March 15, 2021, from the Human Resources Division that Collier County recently completed a review of staff hired in the RM division from January 1, 2018 through February 28, 2021 to "ensure they had met the requirements outlined at the time of hire for their County position" and that the audit process showed that he had not obtained a Class A CDL or an Aquatic Spray license. (Doc. 45-1 at 1).  The memo also indicated that based on his date of hire (June 22, 2020), both requirements should have been completed on or before December 22, 2020. (*Id.*) The March 15, 2021, memo further indicated that Mr. Wilson had until June 15, 2021 (90 days from the date of the memo) to obtain the required licenses, explaining

---

[1] While Mr. Wilson points to this spreadsheet as evidence that the licenses were "not mandatory," (Doc. 62 at 1) Amy Lyberg, the Director of Human Resources at Collier County testified that the spreadsheet "was not used in Mr. Wilson's hiring process" and that the last two columns were "used to provide a snapshot of which RM employees hired from January 1, 2018 to February 28, 2021, had not obtained the job requirements they were required to obtain if they did not already possess them at the time of hire." (Doc. 65 at ¶ 10). Further, Ms. Lyberg pointed out that the specific job posting for the position for which Mr. Wilson applied, which stated that the job *"[r]equires* a valid Class B Commercial Driver's License [and] must obtain and maintain a valid Class A CDL with Air Brake and Tanker Endorsement within six (6) months of hire." (*Id.* at ¶ 12 (emphasis added)); Doc. 49-1 at 3).

6

that if he did not successfully obtain such licenses, the County would "take disciplinary action, which may result in removal from the position that requires these licenses or termination of employment." (*Id.*)   During his deposition, Mr. Wilson admitted that he received the letter informing him that he had not met his licensing requirements (though he stated that he received it in January 2021 instead of March) and that his receipt of this letter came after he had conversations with Mr. Duprey, Mr. Booker, and Mr. Pickens during which they allegedly told him that he did not need to obtain his Class A CDL or his Aquatic Spray license. (Doc. 43-1 at 157).

Mr. Wilson admitted that he was informed that he needed to obtain these licenses by Albert English (the RM Director), Trinity Scott (who replaced Mr. English), Ms. Lyberg, and Joe Frantz (the RM Superintendent). (Doc. 43-1 at 159–60, 193–94; Doc. 50 at ¶¶ 10–13; Doc. 62 at 2). As a result, Mr. Wilson attempted to obtain the Class A CDL and Aquatic Spray license. (Doc. 43-1 at 160).

A June 14, 2021, memo from the Human Resources Division to Mr. Wilson stated that Mr. Wilson requested a two-week extension of time to secure the licenses due to a "COVID exposure in the workplace, which resulted in a County-requested quarantine consistent with CDC guidelines between April l8, 2021 and April 20, 2021." (Doc. 43-1 at 386). The memo advised Mr. Wilson that his request had been granted, which extended Mr. Wilson's Class A CDL and Aquatic Spray license licensure requirements until June 29, 2021. (*Id.*) The memo repeated the warning provided in HR's March 15, 2021, memo, namely that failure to do so would

result in disciplinary action "up to and including separation from service for failing to comply with hiring requirements and minimum qualifications required for [his] position." (*Id.*)  Mr. Wilson admitted that he signed the June 14, 2021, memo.  (*Id.* at 189).

Mr. Wilson fails to become licensed.

      As of July 1, 2021, Mr. Wilson had not obtained either a Class A CDL or the Aquatic Spray license.  (*Id.* at 35, 187–88).  As a result, Mr. Wilson's employment was terminated. (*Id.* at 12, 223).

Mr. Wilson's complaints to Human Resources regarding racial discrimination that he experienced.

      During his tenure with Collier County, Mr. Wilson lodged many complaints regarding racial discrimination, the first of which was received on August 25, 2020. (Doc. 56-1 at 20, 96). Because the reports made by Mr. Wilson were voluminous and do not bear on the Court's decision, the Court will only recount some of Mr. Wilson's allegations here.

      On August 25, 2020, Mr. Wilson complained that Mike Stone shared a book called "Making Friends with Black People" with others in the office.  (Doc. 56-1 at 96; Doc. 43-1 at 100–01).  Also on August 25, 2020, Mr. Wilson complained that William Booker, another supervisor, said that Mr. Wilson did not need training to hold a shovel in his hand.  (Doc. 43-1 at 111–12).  On August 26, 2020, Mr. Wilson reported that Mr. Booker said about the director, "that N****r doesn't know what he is doing." (Doc. 56-1 at 96).  On September 1, 2020, Mr. Wilson reported that an individual had a rebel flag worn around their neck in the office.  (*Id.*)

8

On September 3, 2020, Mr. Wilson reported an incident where a supervisor, Jon Vortherms, looked at him and asked the other supervisors: "Who's the new spot?" (Doc. 43-1 at 234; Doc. 56-1 at 96). At his deposition, Mr. Wilson explained that his original statement was mistaken because it was a different person, Frank Laco, who made that comment. (Doc. 43-1 at 233–35). On that same date, he stated that Mark Martin made the comment, "f*****g n****r doesn't know how to do his job." (Doc. 56-1 at 96).

On October 2, 2020, Mr. Wilson reported that he was targeted by Mr. Booker and Mr. Stone when he was assigned to a certain site. (Doc. 56-1 at 96). And on October 15, 2020, Mr. Wilson reported that there was a verbal altercation between him and Mr. Stone when Mr. Stone came to the worksite to discuss the "Making Friends with Black People" book incident, engaging in behavior that Mr. Wilson perceived as a threat. (Doc. 56-1 at 97; Doc. 43-1 at 122–24). On October 29, 2020, Mr. Wilson reported that he was targeted by Mr. Stone, Mr. Vortherms, and Mr. Johansen when he was at another worksite. (Doc. 56-1 at 97).

Human Resources investigated Mr. Wilson's allegations in late October or early November, and in mid-November 2020, issued several behavior action plans. (Doc. 56-1 at 38). Mr. Wilson later met with the county commissioner, Rick Locastro, to speak with him about his complaints of discrimination; Ms. Lyberg was present at the meeting. (Doc. 43-1 at 79, 169, 250–51).

Record evidence regarding similarly situated employees who were not members of
Mr. Wilson's class and were treated differently than Mr. Wilson.

Mr. Wilson stated that Joe Frantz, "Gio" (later presumed to be Geovanny Gonzalez), Marshal Miller, Scott Pickens, and William Booker were advised that they were required to have certain job requirements, did not meet the requirements, and stayed employed by Collier County past the deadline imposed by the County. (Doc. 43-1 at 40, 76–78).  Each of these assertions was refuted by record evidence.

Mr. Wilson indicated that Joe Frantz, the Superintendent, who is a Caucasian man, was advised to get a license but did not, and stayed employed by Collier County.  (*Id.* at 77–78).  Ms. Lyberg, however, stated that Mr. Frantz received a memorandum in March 2021, informing him of the requirement to obtain an Aquatic Spray license, that he was given until June 15, 2021, to comply, and that he obtained his Aquatic Spray license prior to that deadline.  (Doc. 49 at ¶ 27).  Mr. Frantz testified that his offer letter stated that he would need to obtain an Aquatic Spray license and a Class A CDL within six months of employment, but he did not do so until March of 2021 when he received a memo from Human Resources regarding his failure to obtain an Aquatic Spray license.  (Doc. 61 at ¶¶ 14–16).  Mr. Frantz also testified that he sat for the exam four times before he received a qualifying score.  (*Id.* at ¶ 17).  Given that Mr. Wilson was the party who submitted Mr. Frantz's affidavit, he does not contest that Mr. Frantz obtained his Aquatic Spray license after being informed that he was not in compliance in March 2021. (*See* Doc. 62 at 3).

Mr. Wilson also claimed that someone identified as "Gio" in the deposition was a senior crew leader who had neither a Class A CDL nor an Aquatic Spray license. (Doc. 43-1 at 39–40). Mr. Wilson stated that "Gio" was a Hispanic male. (*Id.* at 197). Presumably, Mr. Wilson was referring to Geovanny Gonzalez, who Ms. Lyberg stated goes by "Geo" and who was a senior crew leader in RM around the time that Mr. Wilson was employed by Collier County. (Doc. 49 at ¶¶ 31, 34–35). Ms. Lyberg stated that Mr. Gonzalez became a senior crew leader on November 14, 2017 and that the position, at that time, required a Class A CDL but did not require an Aquatic Spray License. (*Id.* at ¶ 34). Ms. Lyberg noted that Mr. Gonzalez already possessed the Class A CDL at the time he achieved the senior crew leader position. (*Id.*) Mr. Wilson does not seem to contest this statement, but notes that "Geo Gonzalez was conveniently left off of the list of employees who worked in the Road Maintenance department between January 1, 2018 through February 28, 2018, although he worked in the [RM] department since November of 2017." (Doc. 62 at 4). Defendant explains that Mr. Gonzalez did not appear in the chart because he was not hired or rehired within the timeframe captured by that document. (Doc. 66 at 9); *see also* (Doc. 49 at ¶ 31) ("Geovanny Gonzalez . . . was hired by the County on September 11, 2000.").

Mr. Wilson further asserted that Marshal Miller did not have his Aquatic Spray license and that he was advised that he was required to get such license but failed to. (*Id.* at 38, 39–40, 77–78, 196, 266–67). However, that contention is belied by Mr. Miller's affidavit which explains that he was required to obtain an Aquatic

Spray license after he came the Stormwater Manager in RM on June 5, 2021, and that he obtained such license in September 2021.  (Doc. 48 at ¶ 3).  Mr. Wilson appears to not contest that affidavit, instead claiming that Mr. Miller was not required to have an Aquatic Spray license (just that his position may require such license) and that Mr. Miller "did not have his spray license when [Mr.] Wilson was employed."  (Doc. 62 at 3 (citing Doc. 43-1 at 38)).  That assertion is consistent with Mr. Miller's affidavit because Mr. Wilson's employment was terminated in July 2021 and Mr. Miller did not obtain his Aquatic Spray license until September 2021. (Doc 43-1 at 12, 223; Doc, 48 at ¶ 3).

Next, Mr. Wilson stated that Scott Pickens did not have an Aquatic Spray license and that he was advised that he was required to get such license, but failed to do so.  (Doc. 43-1 at 38–40, 78).  Mr. Pickens testified that he had never had an Aquatic Spray license and that it was not a requirement for his position.  (Doc. 44-1 at 18–19).  Mr. Wilson does not dispute this testimony.  (*See* Doc. 62 at 3).[2]

Finally, Mr. Wilson claimed that William Booker did not have his Aquatic Spray license and that he was advised that he was required to get such license but failed to do so.  (Doc. 43-1 at 39–40; 78; 80–81).  Mr. Booker filed an affidavit confirming that he does not possess an Aquatic Spray license but asserting that he has never been required to have an Aquatic Spray license and that he has never

---

[2] "If a party fails to . . . properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion [and] grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it . . . .").

held the position of senior crew leader, which was Mr. Wilson's position with Collier County.  Mr. Wilson does not dispute this testimony.  (*See* Doc. 62 at 3).

Additionally, in response to an interrogatory requesting that Mr. Wilson "[i]dentify any and all Caucasian employees that [he] believe[s] were similarly situated to [him] with respect to employment with the Defendant but were treated more favorably than [he] [was] in connection with [his] employment," Mr. Wilson responded that Mark Martin "was terminated for not having the required licenses but was rehired shortly thereafter and moved to another department in the county," that Mike Stone "was reprimanded for the discriminatory comments but was never terminated," and William Booker "after complaints of him using the 'N' word in front of several black employees, . . . was only suspended for 5 days." (Doc. 43-1 at 377).  At his deposition, Mr. Martin clarified that he never received a memo advising him that he did not receive his Class A CDL within six months and when asked if he received that license within six months, he stated "it's part of the job description, so I'm sure I did." (Doc. 58-1 at 4).  He also testified that he had an Aquatic Spray license and that he believes he obtained it within six months of employment.  (*Id.*)  Mr. Wilson does not identify Mr. Martin, Mr. Stone, or Mr. Booker as potential comparators in his briefing.  (*See* Doc. 62).

## II.   **Procedural History**

Mr. Wilson filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on August 11, 2021.  (Doc. 22-1 at 1–2).  On September 1, 2021, the EOOC issued Mr. Wilson a right to sue notice (Doc. 22-2),

and Mr. Wilson subsequently filed this action on November 18, 2021 (Doc. 1). On March 28, 2022, Mr. Wilson filed an amended complaint. (Doc. 22). The Amended Complaint asserts four claims for relief: (1) discrimination under Title VII; (2) retaliation under Title VII; (3) discrimination under Section 1981; and (4) retaliation under Section 1981. (Doc. 22 at 7–14).

On April 13, 2022, Collier County filed an answer. (Doc. 23). The mediation in this matter ended in an impasse. (Doc. 38). Collier County moved for summary judgment on March 28, 2023. (Doc. 50). After being granted more time to respond (Doc. 54), Mr. Wilson filed a response on May 2, 2023. (Doc. 62). Defendant filed a reply on May 16, 2023. (Doc. 66).

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is one that "might affect the outcome of the suit under the governing law." *Id.* "[A] mere scintilla of evidence" does not create a genuine issue of material fact, so a nonmoving party may not simply state that "the jury might, and legally could, disbelieve the moving party's evidence." *Hinson v. Bias*, 927 F.3d 1103, 1115–16 (11th Cir. 2019) (citation and internal quotation marks omitted).

14

Courts may not make credibility determinations or weigh the evidence when reviewing the record. *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11th Cir. 2010) ("On summary judgment . . . [n]either [the Eleventh Circuit] nor the district court are to undertake credibility determinations or weigh the evidence."). Instead, courts view evidence and draw all reasonable inferences in the nonmoving party's favor. *Rojas v. Florida*, 285 F.3d 1339, 1341–42 (11th Cir. 2002). But an "inference is not reasonable if it is 'only a guess or a possibility,' for such an inference is not based on the evidence but is pure conjecture and speculation." *Id.* at 1324.

## DISCUSSION

I. **Mr. Wilson cannot show that there is a triable fact with respect to race discrimination because Collier County has proffered a legitimate, non-discriminatory reason for Mr. Wilson's termination, which Mr. Wilson cannot show was pretext for the termination.**

"Title VII prohibits employers from discriminating 'against any individual with respect to [his or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008) (quoting 42 U.S.C. §2000e-2(a)(1)). Previously, the Eleventh Circuit has held that claims under Title VII and under 42 U.S.C. § 1981 "have the same requirements of proof and utilize the same analytical framework." *Smelter v. Southern Home Care Servs., Inc.*, 904 F.3d 1276, 1283 n.3 (11th Cir. 2018) (citation omitted). In 2020, the Supreme Court clarified that, "[u]nlike a Title VII discrimination claim—where a lesser 'motivating factor' standard sometimes applies—a § 1981 claim requires proof

that race was a but-for cause of a termination." *See Ossmann v. Meredith Corp.*, 82 F.4th 1007, 1014 (11th Cir. 2023) (citing *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, --- U.S. ----, 140 S. Ct. 1009, 1013, 1017 (2020)).  "This does not require [a plaintiff] to prove that race was the *exclusive* cause of his termination, but it does require him to prove that but for his race he would not have been terminated." *Id.* (citation omitted) (emphasis in original).

Where, as here, an employee bases his discrimination claim on circumstantial evidence, courts apply the *McDonnell Douglas* burden-shifting framework to determine whether there is circumstantial evidence creating a triable issue of discriminatory intent.  *See McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008)).  *McDonnell Douglas* "is an evidentiary tool that functions as a procedural device, designed only to establish an order of proof and production." *Tynes v. Fla. Dep't of Juvenile Justice*, --- F.4th ---, 2023 WL 8593114, at *4 (11th Cir. Dec. 12, 2023).  It is not "an independent standard of liability under either Title VII or § 1981" and "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion." *Id.* (citation omitted).

Under the *McDonnell Douglas* framework, the employee first attempts to establish a *prima facie* case for disparate treatment by showing that: "(1) [he] is a member of a protected class; (2) [he] was subjected to adverse employment action; (3) [his] employer treated similarly situated white employees more favorably; and (4) [he] was qualified to do the job." *McCann*, 526 F.3d at 1373 (citation omitted).  A

plaintiff who establishes a *prima facie* case is entitled to a "legally mandatory, rebuttable presumption that the employer intentionally discriminated against [him]." *Tynes*, 2023 WL 8593114, at *4 (internal quotation marks and citation omitted). "Under *McDonnell Douglas*, the failure to establish a prima facie case is fatal only where it reflects a failure to put forward enough evidence for a jury to find for the plaintiff on the ultimate question of discrimination." *Id.* at *6. If the employee establishes a *prima facie* case, the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for its action. *McCann*, 526 F.3d at 1373. "[F]ailure to introduce evidence of a nondiscriminatory reason will cause judgment to go against [defendant]." *Tynes*, 2023 WL 8593114, at *4. If the employer provides a legitimate, nondiscriminatory reason for its action, however, the employee must then show that the employer's stated reason was pretext for unlawful discrimination. *McCann*, 526 F.3d at 1373.

It is undisputed that Mr. Wilson is a member of a protected class and that terminating his employment was an adverse employment action. Thus, only the third and fourth elements of the *prima facie* case are at issue here. Accordingly, the Court must analyze if there is a genuine issue of material fact as to whether Collier County treated similarly situated employees more favorably and whether Mr. Wilson was qualified to do the job. *See McCann*, 526 F.3d at 1373.

With respect to whether Mr. Wilson was qualified to do the job, the Court notes that "in termination cases, the question of whether the plaintiff was qualified to do the job is not often at issue." *Crapp v. City of Miami Beach*, 242 F.3d 1017,

17

1020 (11th Cir. 2001).  Moreover, "where a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a prima facie case can be inferred." *Rosenfield v. Wellington Leisure Prods., Inc.*, 827 F.2d 1493, 1495 n.2 (11th Cir. 1987).  Typically, however, the length of employment to show that qualification can be inferred, is much longer than one year.  *See, e.g.*, *Nelson v. N. Broward Med. Ctr.*, No. 12-61867-CIV, 2013 WL 6840234, at \*11 (S.D. Fla. Dec. 27, 2013) (thirteen years); *Morris v. Roche*, 182 F. Supp. 2d 1260, 1282 (M.D. Ga. 2002) (ten years).  Mr. Wilson states that he was qualified for the position because the "position minimum qualifications did not require a CDL A license" and "[he] was able to perform all the essential functions of the job as a senior crew leader in Road Maintenance and there was no need for him to have a CDL A and spray license."  (Doc 62 at 10–11).  It is undisputed, however, that Collier County offered Mr. Wilson his position on the express condition that he obtain specific licenses within six months. Mr. Wilson accepted his job offer pursuant to these terms.   The Court does not sit "as a 'super-personnel department,' and it is not [the Court's] role to second-guess the wisdom of an employer's business decision. . . ." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) (quoting *Chapman v. Al Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000)).  Although Mr. Wilson was initially qualified to begin his employment with Collier County without the Class A CDL and Aquatic Spray licenses, his failure to obtain those licenses by the six-month deadline specified in his offer letter from Collier County rendered him no longer qualified to *continue* his

employment as a senior crew leader.  Thus, the Court rejects Mr. Wilson's assertion that he was qualified for the position because, according to the requirements set forth by Collier County, he was not.  Nevertheless, although the Court finds that his claims fail on this basis alone, the Court will continue its analysis.

Turning to whether Collier County treated similarly situated employees more favorably, the Court must "evaluate whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *McCann*, 526 F.3d at 1373 (internal quotation marks and citations omitted).  "[T]he quantity and quality of the comparator's misconduct must be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."  *Id.* (internal quotation marks and citations omitted). "[O]rdinarily a similarly situated comparator and the plaintiff will: have engaged in the same basic conduct or misconduct, be subject to the same employment policies, have the same supervisor(s), and share an employment or disciplinary history." *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022) (citation omitted).

The record demonstrates that Mr. Wilson has failed to establish a similarly situated comparator.  In his response to the motion for summary judgment, Mr. Wilson identifies Joe Frantz, David Yeates, and Geo Gonzalez as similarly situated employees.  (Doc. 62 at 14–15).  Unlike Mr. Wilson, Joe Frantz obtained his Aquatic Spray license after receiving a memorandum regarding his failure to obtain such license.  (Doc. 49 at ¶ 27; Doc. 61 at ¶¶ 14–17).

The record reflects that Geo Gonzalez already possessed the Class A CDL at the time he achieved the senior crew leader position in 2017 and, at that time, the position did not require an Aquatic Spray license. (Doc. 49 at ¶ 34). Mr. Wilson argues that Ms. Lyberg's affidavit indicating that the Aquatic Spray license was not required at the time is "self-serving" (Doc. 62 at 15), and fails to provide evidence to the contrary. At bottom, while no one explains why the senior crew leader position did not require an Aquatic Spray license in 2017 but did in 2020, the record shows that it did. And Mr. Wilson does not argue that he was treated differently upon hiring—he argues that he was treated differently when he was terminated, which Collier County claims was because he failed to obtain the licenses required by his offer letter. Thus, while this Court must draw all reasonable inferences in Mr. Wilson's favor, his argument that Mr. Gonzalez was required to have an Aquatic Spray license but did not obtain one is pure conjecture and the Court cannot draw an inference in his favor based on this conjecture. *See Rojas* 285 F.3d at 1341–42.

Finally, Mr. Wilson's argument brings up David Yeates as a similarly situated comparator who was treated more favorably. Mr. Wilson states that Mr. Yeates has not obtained a Class A CDL or Aquatic Spray license, but cites to deposition testimony stating that a supervisor "couldn't say for sure, but . . . [does] not believe he has that license" and that he "[does] not know" if Mr. Yeates had an Aquatic Spray License. (Doc. 62 at 15; Doc. 59-1 at 17). Mr. Wilson also states that Mr. Yeates was "conveniently left off of the list of employees created by Defendant" (Doc. 62 at 15), but Defendant has already explained that the list Mr. Wilson refers

to only listed employees hired from January 1, 2018 to February 28, 2021, and Mr. Wilson states that Mr. Yeates has been employed by Collier County for at least ten years.  (*See* Doc. 65 at ¶ 10).  Finally, Ms. Lyberg's affidavit, which presents the only record evidence as to Mr. Yeates's employment with Collier County that is not mere speculation, states that Mr. Yeates was hired in February 2017, that he held positions as Maintenance Worker, Maintenance Specialist, and Crew Leader (not Senior Crew Leader, which was Mr. Wilson's position), and that he was terminated on March 2, 2023, for failure to obtain a Class A CDL, even after being allotted time extensions by Collier County.  (Doc. 49 at ¶ 29).  Again, Mr. Wilson's argument that Mr. Yeates is a similarly-situated comparator is based on pure conjecture that is refuted by record evidence.  So too is Mr. Wilson's argument that "the potential for additional unidentified, similarly suited employees within the Road Maintenance Division without Class A CDL or spray licenses exists" (*see* Doc. 62 at 15), particularly at this stage of litigation, when the discovery period has ended.

As a result, the Court finds that Mr. Wilson cannot identify any similarly situated employees who were treated more favorably than him and therefore has failed to establish a *prima facie* case of race discrimination.

Even if Mr. Wilson could establish a *prima facie* case of race discrimination, however, his claims would still fail because Collier County has proffered a legitimate nondiscriminatory reason for terminating Mr. Wilson's employment. *Tynes*, 2023 WL 8593114, at *4 ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case,

whether the plaintiff really did so is no longer relevant . . . because the district court has before it all the evidence it needs to decide whether the defendant intentionally discriminated against the plaintiff.").

Collier County's burden is "exceedingly light." *Smith v. Horner*, 839 F.2d 1530, 1537 (11th Cir. 1988) (internal quotation marks and citation omitted). The burden is one of "production, not persuasion." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 769 (11th Cir. 2005). The burden involves no credibility determination. *Id.* (citation omitted). "So long as the employer articulates a clear and reasonably specific non-discriminatory basis for its actions, it has discharged its burden of production." *Id.* at 770 (internal quotation marks and citations omitted).

Here. the record demonstrates that Collier County has articulated a sufficient race-neutral justification for terminating Mr. Wilson's employment—namely, Mr. Wilson's failure to obtain the licenses upon which his employer's offer was conditioned.

Mr. Wilson claims that this reasoning was simply pretext for discrimination against him based on his race. (Doc. 62 at 16–17). But "[a] reason cannot be proved to be a pretext *for discrimination* unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original) (citation omitted). If the employer's proffered nondiscriminatory reason is "one that might motivate a reasonable employer, an employee must meet the reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason."

*Chapman*, 229 F.3d at 1030 (citation omitted).  "Federal courts do not sit as a super-personnel department that reexamines an entity's business decisions. . . . [O]ur inquiry is limited to whether the employer gave an honest explanation of its behavior."  *Id.* (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)).  "At the summary judgment stage, the district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."  *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1312 (11th Cir. 2018).

Mr. Wilson has not shown that a reasonable jury could find that the legitimate non-discriminatory reason was false.  Indeed, it is undisputed that Mr. Wilson did not have his Class A CDL or his Aquatic Spray License at the time that he was terminated even though his job description and a human resources memo indicated that he was required to have such licenses within six months of his employment with Collier County.  (Doc. 43-1 at 12, 35, 187–88, 223).  Even after he was warned that his failure to obtain those licenses by a certain deadline could result in termination of his employment (*see* Doc. 45-1 at 1), Mr. Wilson failed to obtain the licenses (Doc. 43-1 at 12, 35, 187–88, 223).  Even more, Collier County provided an extension of time for him to obtain such licenses.  (Doc. 49 at ¶ 29).  Accordingly, because pretext requires a showing that the reason proffered by Collier County was false, Mr. Wilson cannot show that the alleged reason for termination were pretextual.

II.     **Even if Mr. Wilson could make a *prima facie* case for his retaliation claims, Collier County has proffered a legitimate non-retaliatory reason, which Mr. Wilson cannot demonstrate is pretextual.**

Retaliation claims under 42 U.S.C. § 1981 are analyzed under the same framework as Title VII claims.  *Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) ("Retaliation claims are also cognizable under 42 U.S.C. § 1981 and are analyzed under the same framework as Title VII claims.").  An employee establishes a *prima facie* case of retaliation "by proving that [he] engaged in statutorily protected conduct; [he] suffered an adverse employment action; and a causal relation exists between the two events."  *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1307 (11th Cir. 2023).  With respect to causation, to succeed on his retaliation claim, Mr. Wilson must show that his "protected activity was a but-for cause" of his termination.  *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1338 (11th Cir. 2023); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation.").  "The but-for standard asks whether 'a particular outcome would not have happened "but for" the purported cause.'"  *Id.* (quoting *Bostock v. Clayton County*, 590 U.S. ---- (2020)).  "Stated another way, a plaintiff must prove that had [he] not complained, [he] would not have been fired."  *Id.* (citing *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018)).  "Where but-for causation is required, a plaintiff with evidence of only a tagalong 'forbidden consideration' cannot meet [his] summary judgment burden because [he] cannot show 'that the unlawful retaliation would not have occurred in the absence of the alleged wrongful

24

action or actions of the employer." *Id.* (quoting *Nassar*, 570 U.S. at 352).  But "the causal link requirement under Title VII must be construed broadly; a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998).

There is no dispute that Mr. Wilson reported alleged racial discrimination to Human Resources in August 2020.  (Doc. 56-1 at 96).  This qualifies as statutorily protected conduct, and his termination qualifies as an adverse employment action. *Olmsted*, 141 F.3d at 1460 ("It is undisputed that [plaintiff] has met the first two elements of his prima facie case of retaliatory discrimination, *i.e.*, that he engaged in statutorily protected conduct (reporting alleged race discrimination) and suffered an adverse employment action (termination).").  Mr. Wilson's only argument with respect to causation, however, is that "[t]he causal link is irrefutable" because "[b]ut-for Defendant's receipt of the alleged anonymous letter and further complaints by Mr. Wilson in February, May and June of 2021, Mr. Wilson would have continued to perform the essential functions of his job . . . while working to attain his classifications."  (Doc. 62 at 20).  While "[t]he burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action . . . mere temporal proximity, without more, must be very close." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (internal quotation marks and citation omitted).  Indeed, the Eleventh Circuit has previously found that "[a] three to four month disparity between the

statutorily protected expression and the adverse employment action is not enough." *Id.*

   "If an employee establishes a prima facie case, the employer may proffer a legitimate, nonretaliatory reason for the adverse action." *Berry*, 84 F.4th at 1307 (internal quotation marks and citation omitted). "If the employer does so, the employee must prove that the employer's proffered reason was a pretext for retaliation." *Id.* (citation omitted). "If the employer's stated reason is legitimate— in other words, if it might motivate a reasonable employer to act—then the employee must address that reason head on and rebut it." *Id.* (internal quotation marks and citation omitted).

   Although Mr. Wilson's temporal proximity causation argument appears, at best, tenuous, the Court will assume, without deciding, that the temporal proximity here is enough to show causation. Even granting Mr. Wilson that generous assumption, however, his retaliation claim fails as a matter of law because Collier County has stated a legitimate, nonretaliatory reason for terminating his employment and Mr. Wilson cannot show that it was pretextual.

   Here, the legitimate nonretaliatory reason is the same as the legitimate nondiscriminatory reason in the disparate treatment analysis portion of this Order. Mr. Wilson failed to obtain licenses that were required in his offer letter for the position, even after Collier County warned him that failure to do so could result in termination of his employment (Doc. 43-1 at 12, 35, 187–88, 223; Doc. 45-1).

Moreover, as discussed above, Plaintiff's claim fails at the pretext stage of the analysis because other than his self-serving statements that are contradicted by evidence in the record, Plaintiff has presented *no evidence* that Collier County's stated nondiscriminatory reason for terminating him—failure to obtain necessary licenses—was pretext for retaliation; Mr. Wilson had been warned that failure to obtain the licenses by a certain deadline could result in termination of his employment.  (Doc. 45-1 at 1).

III.  **Mr. Wilson fails to present a convincing mosaic of circumstantial evidence demonstrating that Collier County discriminated against him because of his race.**

Finally, Mr. Wilson also argues that even if he did not meet his burden of proof via the *McDonnell Douglas* framework, he has presented a "convincing mosaic of circumstantial evidence demonstrating that Collier County discriminated against him because of his race."  (Doc. 62 at 20).

Indeed, even where a plaintiff fails to make a *prima facie* case under the *McDonnell Douglas* framework, "an employee can still survive summary judgment by presenting circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent."  *Jenkins*, 26 F.4th at 1250 (internal quotation marks and citation omitted); *see also Tynes*, 2023 WL 8593114, at *5 ("A plaintiff who cannot satisfy [the *McDonnell Douglas*] framework may still be able to prove her case with what we have sometimes called a 'convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker") (citation omitted).  The Eleventh Circuit has noted that "[a] failure

in the prima facie case often also reflects a failure of the overall evidence." *Tynes*, 2023 WL 8593114, at *5. Thus, "[e]ven though we do not dwell on whether the technical requirements of the prima facie case are met once the defendant has met its burden of production, we keep in mind that the questions the plaintiff must answer to make a prima facie case are relevant to the ultimate question of discrimination." *Id.*

The Eleventh Circuit has explained that the convincing mosaic theory "can be of particular significance" where, as here, "the plaintiff cannot identify a similarly situated comparator" for purposes of *McDonnell Douglas*. *Bailey v. MetroAmbulance Servs., Inc.*, 992 F.3d 1265, 1273 n.1 (11th Cir. 2021) (per curiam) (collecting cases). "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (internal quotation marks and citation omitted). A convincing mosaic can be established by demonstrating "(1) suspicious timing, ambiguous statements or other information from which discriminatory intent may be inferred, (2) systematically better treatment of similarly situated employees, and (3) pretext." *Id.* (internal quotation marks and citation omitted). "A convincing mosaic of circumstantial evidence is simply enough evidence for a reasonable factfinder to infer intentional discrimination in an employment action—the ultimate inquiry in a discrimination lawsuit." *Tynes*, 2023 WL 8593114, at *5. In pursuing the evidentiary threads to create a convincing mosaic, a plaintiff must "present the tiles and create the mosaic

28

[rather than] expecting the court to piece it together for him." *Murphree v. Colvin*, No. CV-12-BE-1888-M, 2015 WL 631185, at *8 (N.D. Ala. Feb. 13, 2015).

Mr. Wilson asserts eleven reasons that he believes present a convincing mosaic of circumstantial evidence of discriminatory intent that resulted in his termination.  (Doc. 62 at 21–23).  These reasons can be split into the following categories, which the Court will consider in turn: (1) suspicious timing; (2) the repeated use of racially discriminatory terms in the workplace by various supervisors; and (3) other "bits and pieces" of evidence (*see Lewis v. City of Union City, Georgia*, 934 F.3d 1169, 1185 (11th Cir. 2019) ("A convincing mosaic may be shown by . . . bits and pieces from which an inference of discriminatory intent might be drawn.").

With respect to suspicious timing, Mr. Wilson mentions "HR's failure to approach [him] regarding his CDL license and providing [him] a license memo nine months after his employment although HR was notified of [his] lack of CDL A In November of 2020," "Plaintiff's termination after reporting multiple instances of race discrimination and retaliation, including a complaint to County Commissioner Rick Locastro and Amy Lyberg within 6 weeks of his termination," and Collier County's "failure to conduct investigations into the status of employees['] CDL compliance, as far back as 2015."  (Doc. 62 at 21–22).  With respect to the first argument, Mr. Wilson was required to obtain his Class A CDL and Aquatic Spray License within six months of his employment.  (Doc. 43-1 at 353).  He was hired on June 22, 2020, so he needed to come into compliance no later than December 22,

2020.  (Doc. 43-1 at 10, 18; Doc. 45-1 at 1).  Human resources notified him that he was not in compliance with this requirement on March 15, 2021.  (Doc. 45-1 at 1).  A few months' delay is not suspicious, even if HR knew that he had not obtained the licenses in November 2020 (one month before he was required to have complied).  The timing of Plaintiff's termination happening six weeks after he last complained of racial discrimination appears suspicious at first glance but becomes much less so when viewed in light of the fact that Mr. Wilson received a letter from HR ***three months*** before his termination, informing him that failure to comply with the licensing requirements by the extended deadline could result in removal from the position or termination of employment.  (Doc. 45-1 at 1).  Although Mr. Wilson did not specifically make this argument, the Court has also considered whether the timing of the audit leading to the discovery of Mr. Wilson's non-compliance was suspicious.  Ms. Lyberg testified that the audit was conducted because Collier County received an anonymous letter indicating, among other things, that Mr. Wilson did not have the necessary licenses for his position.  (Doc. 56-1 at 26, 106).  Ms. Lyberg testified that she does not know who sent this letter, but that the letter caused Human Resources to review *everyone* who had been hired within a certain period of time and verify whether they had achieved the necessary licenses and qualifications, which Human Resources had not done in at least six years.  (Doc. 56-1 at 26).  The Court does not find this circumstantial evidence of timing suspicious.  Human Resources received a complaint that Mr. Wilson did not have his required licenses and decided to conduct an audit of all employees in the department to

30

ensure that he and others were compliant with the terms of their employment. According to Ms. Lyberg, "there were multiple individuals that were found to be deficient when we completed our review." (Doc. 56-1 at 33). Indeed, it would have been more suspicious for Collier County to audit Mr. Wilson but not other employees required to hold certain licenses.

The repeated use of racially discriminatory terms in the workplace is well-documented in this record and, viewing the record in the light most favorable to Mr. Wilson, as this Court must, the Court accepts that the testimony regarding the use of derogatory terms towards Black people in the workplace is true. Under binding case law, even racially discriminatory statements that "are either too remote in time or too attenuated because they were not directed at the plaintiff" to be direct evidence may still be circumstantial evidence to support an inference of discrimination. *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1291–92 (11th Cir. 1998). "Although a comment unrelated to a termination decision may *contribute* to a circumstantial case for pretext, . . . it will usually not be sufficient absent some additional evidence supporting a finding of pretext." *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1229 (11th Cir. 2002) (citation omitted).

The Court has already found that Mr. Wilson is unable to show that Collier County's proffered reason for his termination was pretextual. While the derogatory comments made by multiple people in Collier County (including supervisors) are certainly very disturbing, there is no evidence that Trinity Scott (who Defendant claims decided to terminate Mr. Wilson's employment (Doc. 66 at 7)) or Albert

31

English (who Plaintiff claims was the decisionmaker (Doc. 62 at 4)), made any such comments or harbored any discriminatory animus against Mr. Wilson because of his race. *See Anderson v. WVMG-42*, 253 F.3d 561, 566 (11th Cir. 2001) ("Disparate treatment analysis requires that none of the participants in the decision making process be influenced by racial bias"). In some cases, a plaintiff can prove discriminatory intent by showing that the employer's decisionmaker "rubber stamp[ed]" a "biased recommendation" to fire the plaintiff. *See Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999) (explaining that one way to prove discriminatory animus behind the recommendation is under the "cat's paw" theory, which provides that causation may be established if a plaintiff shows that a decisionmaker followed another's biased recommendation without independently investigating the complaint); *see also Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1565 (11th Cir. 1987) (reversing district court's grant of summary judgment to defendant where decisionmaker was influenced by plaintiff's direct supervisor to retaliate against plaintiff for refusing his sexual advances). Here, there is no record evidence that Ms. Scott or Mr. English relied on anyone's biased recommendation without independently investigating the issues with Mr. Wilson's employment. Having closely reviewed this summary judgment record, the Court concludes that there is no evidence to support the notion that racial animus at Collier County influenced the ultimate decision to terminate Mr. Wilson.[3]

---

[3] The Court admonishes the workplace behavior outlined in this opinion. Although the record demonstrates that Collier County has taken steps to discipline this

Mr. Wilson presents a variety of other arguments that he believes present a convincing mosaic of circumstantial evidence. First, he states that he is "the only employee in [RM] who was required to have both a Class A CDL and Aquatic spray license." (Doc. 62 at 21). Indeed, on the spreadsheet of RM employees compiled by Human Resources, Mr. Wilson is the only person who requires both a Class A CDL and an Aquatic Spray license. (Doc. 62-2). But he is also the only Senior Crew Leader listed. (*Id.*) Moreover, uncontroverted evidence in the record shows that Joe Frantz and Mark Martin each needed *and obtained* an Aquatic Spray License and a Class A CDL. (*See* Doc. 61 at ¶¶ 14–16; Doc. 58-1 at 4). Finally, the requirement for both an Aquatic Spray license and a Class A CDL was first specified in the job posting (Doc. 65 at ¶ 12; Doc. 49-1 at 3) and noted again in the offer letter (Doc. 43-1 at 352). Thus, no reasonable jury could find that the requirement itself is circumstantial evidence of a discriminatory motive. Put simply, it is undisputed that the senior crew leader position for which Wilson was hired to perform required that the successful applicant obtain both a Class A CDL and Aquatic Spray licenses within six months of employment. Mr. Wilson undisputedly did not obtain those licenses within six months of his employment with Collier County as a senior crew leader and failed to obtain such licenses after being given more time to do so.

Next, Mr. Wilson asserts that "[h]uman resources fail[ed] to conduct investigations into Wilson's discrimination complaints after their initial

---

workplace behavior, the Court is hopeful that continued measures are taken to prevent it from reoccurring.

investigation was completed in November of 2020." (Doc. 62 at 21). Mr. Wilson identified at least three complaints about issues occurring after November 2020. The first was in late February 2021, when Mr. Wilson made a complaint against an RM employee for saying "morning boys" to him and another African American employee. (Doc. 62 at 9; Doc. 57-1 at 17). Becky Johnson, of Human Resources, stated during her deposition that "those allegations were handled on the division level" and that Mr. English addressed it with the employee who made that comment, which was "the trigger that pretty much made her resign." (*Id.* at 17–18). Human resources did not undertake an investigation because they believed that Mr. English was addressing the complaint. (*Id.* at 18). That testimony has not been disputed. Collier County also received a Florida Commission on Human Rights complaint on June 17, 2021, which indicated multiple offenses. (Doc. 56-1 at 99). Finally, Mr. Wilson also had a meeting with County Commissioner Rick Locastro (Doc. 43-1 at 79, 169, 250–51) about the "[s]ame facts of discrimination and issues that [he] was having down at [RM]." (Doc. 43-1 at 250–51). Mr. Wilson has presented no evidence that there was no further investigation done. And it is also unclear why further investigation was necessary when an investigation about many related issues was already conducted and behavior action plans were issued. (Doc. 56-1 at 38). In sum, under these circumstances, the Court finds that the lack of further investigation could be circumstantial evidence of discriminatory motive, but does not alone contribute meaningfully to Plaintiff's circumstantial evidence mosaic.

Next, Mr. Wilson points to "Defendant providing the wrong study material to Wilson to study for his spray licenses and then penalizing him for not acquiring the license." (Doc. 62 at 22). Defendant does not provide a record citation supporting this allegation, and the Court is unable to locate record evidence of Collier County providing incorrect study material to Mr. Wilson. Nor could the Court locate any record evidence providing that Collier County was required to provide Mr. Wilson with study materials or otherwise assist him in obtaining the required licenses.

Mr. Wilson then refers to "testimony from [his] direct supervisor saying he could fully perform the essential functions of his job." (Doc. 62 at 22). Again, Mr. Wilson provides no citation for this assertion, but even accepting it as true, the fact that Mr. Wilson can perform the essential functions of his job is not circumstantial evidence of discriminatory intent where he lacked licenses that Collier County determined were *required* for the position he was hired to do. Elsewhere in his briefing, Mr. Wilson states that "[a]s far back as 2015, Defendant had not taken as drastic an action, as to completely terminate an employee for not obtaining a CDL Class A license." (Doc. 62 at 12 (citing Doc. 56-1 at 108)). But Mr. Wilson takes Defendant's statement out of context. Ms. Lyberg testified that she would have to review records to know whether Collier County had terminated another employee for not obtaining a Class A CDL or an Aquatic Spray license since 2015, but stated that she personally could not recall terminating someone for that reason. (Doc. 56-1 at 28). The Court does not find that any of these allegations contribute to

circumstantial evidence of a discriminatory motive causing the termination of Mr. Wilson.

Next, Mr. Wilson repeats his argument that Mr. Yeates and Mr. Gonzalez worked in a substantially similar position to him without the requisite licenses and were not disciplined.  (Doc. 62 at 22).  But Mr. Yeates was not a senior crew leader and was terminated on March 2, 2023, for failure to obtain a Class A CDL, even after being allotted time extensions by Collier County.  (Doc. 49 at ¶ 29).  Mr. Gonzalez already possessed the Class A CDL at the time he achieved the senior crew leader position in 2017 and, at that time, the position did not require an Aquatic Spray license.  (*Id.* at ¶ 34).  Mr. Wilson states that Mr. Yeates and Mr. Gonzalez are relevant even if they are not strict comparators.  (Doc. 62 at 22).  But the fact that Mr. Yeates was terminated for not possessing a Class A CDL cuts against Plaintiff's claim that he was the only one who was disciplined for not possessing a necessary license.  The evidence about Mr. Gonzalez is slightly more helpful to Plaintiff, but on its own could not convince a reasonable jury that there is circumstantial evidence of Collier County's discriminatory motive.

Finally, Mr. Wilson finds it suspicious that Defendant alleges that "Trinity Scott made the decision to terminate Plaintiff's employment although the County previously alleged that English made the final decision and recommended the termination of Christopher Wilson."  (Doc. 62 at 22 (citing Doc. 56-1 at 108)).  Even if the Court found that the identity of the decisionmaker presented a genuine issue of material fact, because there is no record that either Mr. English or Ms. Scott

36

made discriminatory remarks, the Court is unsure why the identity of the decisionmaker is relevant to whether Collier County discriminated against Mr. Wilson.

In conclusion, whether the Court considers the issue via the *McDonnell Douglas* framework or the convincing mosaic framework, Mr. Wilson has not presented enough circumstantial evidence such that a reasonable factfinder could infer intentional discrimination with respect to Collier County's termination for Mr. Wilson's employment.

## CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment as to Plaintiff's Amended Complaint (Doc. 50) is **GRANTED**.  The Clerk of Court is **DIRECTED** to enter judgment accordingly, terminate all deadlines, and close the case.

**ORDERED** at Fort Myers, Florida on December 27, 2023.


JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE